Filed 4/25/22  P. v. Fields CA3
Opinion following rehearing

NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C068047 |
| Plaintiff and Respondent, | (Super. Ct. No. 09F04709) |
| v. | |
| ELIJAH RASEAN FIELDS et al., | OPINION ON REHEARING |
| Defendants and Appellants. | |

According to Aesop, the Greek storyteller, "uninvited guests seldom meet a welcome." And that was the case when defendants Elijah Rasean Fields and Corey Andre Carmicle arrived at a Halloween costume party hosted by Patrick Razaghzadeh and his roommates. One invitee brought along a cousin who was a member of the Monk Mob gang, who in turn brought along some fellow gang members, including Fields and Carmicle. The mix of the uninvited with the invited proved to be combustible and ultimately, deadly, because Carmicle brought a gun to the festivities. He passed it to

1

Fields who, resisting an effort by Razaghzadeh to oust the uninvited guests began firing, with deadly consequences, hitting five people including Razaghzadeh who died.

An amended information charged defendants each with one count of murder and four counts of attempted murder. The information also alleged defendants committed the crimes for the benefit of a criminal street gang. (Pen. Code, §§ 187, 664/187, 186.22, subd. (b)(1).)[1] A jury found both defendants guilty of murder and three counts of attempted murder, with enhancements for personal firearm use, discharge of a firearm, discharge of a firearm resulting in great bodily injury, being armed with a firearm, and committing the crimes for the benefit of a criminal street gang. (§§ 186.22, subd. (b)(1), 12022, subd. (a)(1), 12022.5, subd. (a)(1), 12022.53, subds. (b)-(e).) The court sentenced Fields to 100 years to life in state prison, consecutive to a determinate term of 45 years, and sentenced Carmicle to 100 years to life, consecutive to a determinate term of 18 years.

Both defendants appealed. Following oral argument we vacated submission and solicited additional briefing on recently passed legislation, after which we ordered the matter on calendar for additional argument. Argument ensued and the matter was resubmitted but submission was again vacated to receive additional briefing. Upon the close of additional briefing we took the matter under submission and filed our opinion vacating Fields's 10-year gang enhancement under section 186.22, subdivision (b)(1)(C) but otherwise affirming the judgments. We thereafter granted rehearing and vacated our decision. Since that time the parties have engaged in multiple rounds of supplemental briefing. We again consider Fields's arguments of instructional error concerning voluntary intoxication and Carmicle's arguments asserting instructional error on direct aiding and abetting and natural and probable consequences theory; error in failing to

---

[1] All further statutory references are to the Penal Code unless otherwise designated.

2

instruct on voluntary manslaughter based on sudden quarrel/heat of passion and misdemeanor manslaughter; improper closing remarks by the prosecution on gangs; insufficient evidence to support the gang enhancements; and erroneous instructions on voluntary intoxication as a factor in forming the mental state for direct aiding and abetting or natural and probable consequences.

Later changes in the law stemming from Supreme Court decisions, legislation and ballot measures led defendants to file supplemental briefs making additional arguments, as follows:

(1) At the time Fields was charged, the prosecution could choose, in some cases, to prosecute minors who were at least 16 years old in adult court. Proposition 57 changed the rules to provide that a minor could be prosecuted in adult court only if the juvenile court, after a hearing, first finds the minor to be unfit to be prosecuted as a juvenile. (Welf. & Inst. Code, § 707, subd. (a)(1).) Fields seeks a conditional reversal and remand to the juvenile court to conduct a fitness hearing.

(2) In light of sections 3051 and 4801 relating to the parole of juvenile offenders, enacted after their sentencing, and under the compulsion of *People v. Franklin* (2016) 63 Cal.4th 261, defendants contend we must order a limited remand for a new sentencing hearing at which defendants will have the opportunity to present mitigating evidence relating to the mitigating factors of youth.

(3) The verdict improperly relied on inadmissible hearsay testimony of the prosecution's gang expert in contravention of *People v. Sanchez* (2016) 63 Cal.4th 665.

(4) In light of Senate Bill No. 620 (2017-2018 Reg. Sess.), ending the statutory prohibition on a court's ability to strike a firearm enhancement allegation, the case must be remanded to permit the court to exercise its discretion to strike the firearm enhancement.

(5) Because Carmicle's murder conviction rested on a natural and probable consequences theory of liability, abrogated by the Legislature in Senate Bill No. 1437

3

(2017-2018 Reg. Sess.), his conviction must be reversed.  Senate Bill No. 775 (2021-2022 Reg. Sess.) permits this issue to raised and addressed on direct appeal.

(6) In *People v. Canizales* (2019) 7 Cal.5th 591 (*Canizales*), our Supreme Court disapproved the language of the kill zone instruction given by the trial court.  The *Canizales* holding compels reversal of the attempted murder convictions in this case.

(7) Assembly Bill No. 333 (2021-2022 Reg. Sess.) amended section 186.22, effective January 1, 2022, to narrows the definition of a pattern of criminal gang activity in such a way that the evidence presented in this case is inadequate to establish such a pattern, compelling reversal of the gang enhancement.

## FACTUAL AND PROCEDURAL BACKGROUND

### Prelude to the Party

The events in this story unfolded in a house Razaghzadeh shared with Melissa Meyenberg, Spencer Bell, and Jeff Acosta.  Razaghzadeh and his girlfriend, Kristen Rau, planned a Halloween party, and each roommate invited friends.  Prior to the party, Rau e-mailed friends about their costumes.

A few days before Halloween, Kyle Camp-Kelly invited his cousin, Charles Ferrell, to a Halloween party at his house.  However, on Halloween night the party moved to Razaghzadeh's house.  Camp-Kelly, a good friend of Razaghzadeh, drove to the house with several friends the evening of the party.

### Defendants Learn of the Party

On Halloween evening, Willie Harris picked up Carmicle and Fields and drove them to a party in North Highlands.  At the party, Carmicle sold some Ecstasy pills to Harris.  Harris, Carmicle, and Fields drove to Carlos Allen's house, where Carmicle got a phone call from Ferrell.  Ferrell told them he was having a party and the group decided to attend.

4

The group met up with Ferrell, Willie Tolliver, and someone named Chris. The group smoked marijuana and Harris, Carmicle, and Jarrell Triplett took Ecstasy. Ferrell wore a white sweatshirt; the others wore hoodies or pea coats.

Ferrell went into a liquor store and bought two-fifths of Hennessy. He brought the Hennessy to the passenger side of Harris's van. Carmicle, in the driver's seat, showed Ferrell a gun, a gray semiautomatic. Ferrell told Carmicle he should probably not bring the gun to his cousin's party.

Carmicle, Fields, Triplett, "Jay," and Allen rode in the van, following a car containing Ferrell, Toliver, and Chris to Camp-Kelly's party. Camp-Kelly called Ferrell and told him the party had moved. Ferrell called the van and told them of the change in plans.

As they drove, Carmicle drew his gun and told Harris, "I'm going to do a Mac Dre." Harris interpreted this as Carmicle's intention to shoot the gun off in the car while driving on the freeway. Harris became angry and asked Carmicle why he brought the gun. Carmicle said the gun was for protection. Harris did not think the other passengers saw the gun. Carmicle repeatedly pointed out that Halloween was the Monk Mob's anniversary.

As they approached Razaghzadeh's house, everyone except Jay yelled "Monk Mob" and "the Mob is here" out the van's sliding door. After Harris parked the van, the group joined Ferrell, Toliver, and Chris. Everyone walked to the house.

**Defendants Join the Party**

That evening, Daniel Buckner, Jason Boggs, Bradley Chastain, Matt Chastain, Justin Bailey, and Matt Eddie, wearing costumes, attended the party. They arrived to find approximately 30 people already at the party. A group played "beer pong" in the garage; others socialized and commented on one another's costumes. Buckner saw Razaghzadeh, who appeared in good spirits.

Razaghzadeh's friend, Chris Buttler, was smoking out front and saw the group arrive. Since none of the group wore costumes, Buttler asked them whom they knew at the party. Ferrell said he was Camp-Kelly's cousin. Camp-Kelly came outside and vouched for the group. Although Camp-Kelly was surprised at the size of the group accompanying Ferrell, he believed everyone would get along.

Jessica Romo, Acosta's girlfriend, testified that prior to the group's arrival, there were only a few black people at the party. The arrival of a large group of black gang members not in costume startled partygoers. Romo became very upset when one of the group placed his hand on her bottom. Romo heard one of the newcomers say, "Crip something" and "pills" and make a hand sign. One of the group offered to sell Ecstasy and pills.

Buckner saw the group walk out to the side yard where he and Bradley Chastain stood smoking. The group did not seem hostile, but neither did they seem friendly. Buckner identified Carmicle as one of the members of the group.

The group stayed together in the side yard and drank Hennessy. Harris testified that as a song played, Carmicle, Fields, Triplett, and Allen threw up their hands and made Mob and Crip hand signs as they said, "Mob." Harris also was "throwing up Highlands" and demonstrated the hand sign he made. Although he was not a gang member, Harris made the Highlands hand sign because he was from North Highlands.

**Tensions Erupt**

A large man in costume walked up to the group and offered his Hennessy bottle to Carmicle. Carmicle declined and the man said, "Just hit the bottle." Carmicle became angry and told the man, "Fuck you nigga. It's the Mob."

Buckner heard someone from the group say, "You don't know where I'm from." Ferrell later told detectives Carmicle started "banging. He said this is Monk Mob. Mob brought its own bottle." According to Ferrell, Carmicle often was loud, and his confrontational behavior was not unusual.

Harris stepped in between Carmicle and the costumed man and said, "Hold on, bro.  He said he don't want to hit your bottle."  The other man called Harris a bitch and Harris "kind of lost it."  To break the tension, Ferrell and Triplett took a drink from the man's bottle.

Razaghzadeh's housemate, Meyenberg, came out of the house and said her camera was missing from the garage.  She told Razaghzadeh she did not know the new arrivals and did not feel safe.  Meyenberg asked Razaghzadeh if he could get them to leave, and he suggested they both approach the group.

Meyenberg asked Ferrell if his friends had taken her camera.  She politely asked some of the group to leave, but they said they had a right to be at the party and called her a racist.  Ferrell was upset that Meyenberg kept asking about her missing camera.  The camera later turned up in the possession of a friend Ferrell had invited to the party.

Razaghzadeh and housemate Bell confronted other members of the group.  Bell asked the group, which included Harris, Ferrell, Allen, Carmicle, Fields, Triplett, and Jay, to either don a costume or leave the party.

Camp-Kelly approached and told Bell, "[T]hey are cool, they are cool, it's all good, they are all right."  Bell disagreed, saying, "[N]o, they are not cool.  You need to tell them to leave.  This is my house."

**Escalation and Explosion**

Bell yelled at the group, telling them to "get the 'f' out" of his house.  Ferrell's group responded:  "[F]uck that.  We ain't trying to leave."  Carmicle said, "[W]e ain't going nowhere.  [¶]  The mob is here."

Someone called Razaghzadeh a "faggot" and other names, causing Bell to yell louder.  Camp-Kelly held Razaghzadeh back and attempted to calm him.  Michael White grabbed Bell and told him to calm down.  Bell asked Camp-Kelly to tell the group to leave.  Buckner saw people in the group making hand signals that looked like an "M."

7

Camp-Kelly told Razaghzadeh that Robert Ferrell, Charles Ferrell's cousin who was also at the party, was family and that he was cool. Razaghzadeh apologized to the group, saying, "I kind of disrespected y'all, you know; just have a good time." However, Camp-Kelly did not believe Carmicle accepted the apology. Camp-Kelly noticed Carmicle's eyes were red and he seemed to be on drugs.

Razaghzadeh shook hands with Jay and Harris. When he extended his hand to Fields, Fields responded with either, "You would try to shake my hand, bitch" or "punk bitch. Yeah, you should apologize." Harris heard someone say, "Fuck that, nigga" and "Mob."

After the verbal assault, Razaghzadeh told the group, "[T]his is my house, these are my friends," and "I'm not scared of you." Razaghzdeh and about seven of his friends began to circle the other group. Razaghzadeh ran at the group and Allen punched him, knocking him into a barbecue grill.

**The Shooting**

Harris saw Carmicle pass his gun to Fields and say, "Here, I can't hold this. I'm too fucked up to hold this." It was the same gun Carmicle had shown Harris earlier. Fields began firing. Five bullets hit Razaghzadeh, two hit Camp-Kelly, two hit Bell, one hit Bailey, and one hit White.

The party fell silent as partygoers dropped to the ground; then some people got up and began screaming. Buckner got up and looked in the direction of the shots. He saw Camp-Kelly on the ground screaming that he had been shot. Buckner helped Camp-Kelly, who had been shot "in the back and out the stomach." Buckner returned to the backyard to find others trying to perform CPR on Razaghzadeh. Buckner checked for a pulse but could not find one.

**The Aftermath**

Buckner saw people running through the garage and the house in an effort to get away. Harris ran to his van, and Fields, Triplett, and Allen jumped in. Harris started the

van and picked up Jay. Fields said, "I think I just killed my nigga's cousin, I think I just killed my nigga's cousin."

As Harris drove away, several police cars drove toward them. Harris turned down a side street and began driving wildly. He told everyone to get out of the van.

Fields gave the gun to Allen and got out of the van. Harris told Allen to put the gun in a drawer under the passenger seat. Harris and Allen later met Carmicle and a companion. Allen gave Carmicle the gun.

Later that morning, Carmicle came to Harris's mother's house. Harris described Carmicle as looking "real tore back." He was not sure if Carmicle was drunk or high. Carmicle showed Harris a .44-caliber revolver and said, "Look, I already got another gun." A few weeks later, the duo left the state.

**The Injuries**

Camp-Kelly remained in the hospital for several weeks. At trial, he still had a bullet fragment in his lower spine and nerve damage to his left foot and leg.

Bell was shot in the left arm and right thigh. He suffered a broken radius bone, and damaged nerves and tendons. Bell underwent three surgeries and a year of physical therapy.

A bullet grazed White's arm. Bailey had been shot in the left leg, resulting in a fractured tibia. He remained in a cast for three months and lost flexibility in his leg. Complications from blood clots led to further hospitalization.

**Razaghzadeh's Autopsy**

A forensic pathologist testified about the results of the autopsy on Razaghzadeh. One bullet entered Razaghzadeh's forehead, another struck his right abdomen, two hit his left thigh, and a bullet grazed his right thigh. The pathologist stated Razaghzadeh died from gunshot wounds to his head, abdomen, and left thigh.

## The Investigation

Just after midnight on November 1, 2008, officers responded to a report of gunfire. At the scene, officers found chaos. They ordered people to lie down in order to ascertain whether they were suspects, witnesses, or victims. More than 30 people were at the scene; they were angry and hostile. Some people were in costume, and officers found bottles of alcohol and beer cans.

Paramedics pronounced Razaghzadeh dead. Officers recovered two 9-millimeter shell casings in the yard. Numerous other casings were later found near the first two. A bullet was found underneath Razaghzadeh's body.

Officers obtained a wiretap order enabling them to monitor conversations of targeted individuals. Detectives conducted interviews in order to generate telephone conversations between the people being monitored. A May 2009 three-way call between Triplett, Carmicle, and Fields was played for the jury. During the call, Triplett told Carmicle that Allen had been talking about Carmicle's "snitchin' " on Allen.

Subsequently, officers arrested Ferrell, Carmicle, Fields, Toliver, Allen, Triplett, and Harris for the murder of Razaghzadeh and the attempted murder of the others. Several of those arrested testified at trial.

## Ferrell's Testimony

Ferrell became part of the Monk Mob in high school. The Monk Mob was formed on Halloween, and Toliver brought Ferrell into the gang.

After Ferrell joined the Monk Mob, the group met to discuss how to get money and to formulate gang rules. At one meeting, the members discussed selling drugs, pimping prostitutes, committing robberies, and other illegal activities as ways to get money. The Monk Mob sold Ecstasy pills and marijuana. Members also discussed concealing their identities by hiding their faces while engaged in illegal activity.

At a gang meeting, members chose nicknames to conceal their identities while engaged in illegal activities. Ferrell testified that both Fields, nicknamed Famous, and

Carmicle, nicknamed Dice, were members of the Monk Mob. Other members were Triplett, nicknamed Poopa; Allen, nicknamed Cla; and Harris, nicknamed Calvo.

The group was previously known as Monk L, which stood for "Money Orientated Niggas Killing Legends." One of the gang rules was that no one fought by himself. Monk Mob was a close-knit family, and there is strength in numbers. Members also understood that when they went out as a group, one member would be armed with a gun for protection from outsiders.

Beast Mob was a rival gang. When the two gangs met, trouble would erupt. Shootings and fights broke out between the two gangs. Ferrell testified Monk Mob members carried guns to parties, unless it was a family party.

After proving less than cooperative in interviews with detectives, Ferrell was arrested as an accomplice. Following several months in jail, Ferrell agreed to cooperate with the district attorney. The charges against him were dropped.

**Harris's Testimony**

Harris is Carmicle's cousin and has known him all his life. Around the time of the murder, Harris and Carmicle saw each other daily.

Initially, Harris lied about his part in the shooting. Harris faced pressure not to talk and to "[s]tay true to the hood." His family cut him off after he agreed to testify.

The day before Halloween, Harris drove Carmicle and Fields in his van to Toliver's apartment. Harris waited in the van while Carmicle went to the apartment to pick up marijuana from Toliver. When Carmicle returned, Toliver's brother Lorenzo Tolliver was driving in and started talking to Carmicle. Carmicle pulled out a nine-millimeter handgun. Carmicle told Lorenzo the gun was brand new.

During cross-examination, Harris admitted he lied at the preliminary hearing. At the hearing, Harris testified Fields held a gun to his head after they left the party to make sure he picked up Jay.

11

Following the shooting, Harris was arrested and charged with murder and four counts of attempted murder. Harris entered into an agreement to cooperate with the district attorney, and the charges were dismissed.

**Lorenzo Toliver's Testimony**

Toliver's brother Lorenzo testified reluctantly after being jailed for failing to respond to a subpoena. The day before Halloween 2008 Lorenzo saw Carmicle and Harris together in a van. He denied seeing Carmicle with a nine-millimeter pistol. Previously, Lorenzo told detectives he had seen Carmicle with a gun in order to regain custody of his child.

In addition, Lorenzo denied that following the shooting Carmicle told him: "Niggas rushed up on us, so you know how the mob get down, nigga. We don't be playing, and shit, you know. One of the little homies . . . pulled out a gun and started shooting." Although he gave the statement to a detective, Lorenzo almost immediately retracted it. Around the time of the shooting, Lorenzo spent time with Carmicle, who would have his gun out "[w]hen we all got together in a crowd."

**Antonio Hughes's Testimony**

Antonio Hughes knew Fields through Fields's mother, Rachel Jordan. In April 2009 Hughes spoke with Jordan about the shooting. Jordan told Hughes that Fields admitted his involvement. According to Jordan, Fields was the shooter. Hughes believed his testimony put him in danger.

During cross-examination, Hughes testified that Jordan told him there was a guy at the shooting who had been "fucked up on E pills" to the point where he had to give his gun to Fields to hold.

**Gang Expert Testimony**

Detective John Sydow testified as an expert on criminal street gangs. Sydow first became aware of the Monk Mob in in 2006 or 2007. Tolliver formed the gang on Halloween 1999. The predominant gang in the area is the North Highlands Gangsta

12

Crips (NHGC). The Monk Mob is not an offshoot of the Crips but is under the control of NHGC.

Sydow estimated that the Monk Mob had between 25 and 30 members in 2008. The gang's primary activities in 2008 consisted of strong-arm robberies, armed robberies, selling Ecstasy and marijuana, and burglaries. The Monk Mob also took part in pimping, assaults with firearms, and drive-by shootings.

In Sydow's opinion, Fields belonged to the Monk Mob at the time of the shooting. Fields had been identified as a member of the gang by fellow members Tolliver, Allen, Ferrell, and Triplett.

Fields posted a short video on his Myspace page. In the video, Fields made the Monk Mob hand sign and talked about being from "the mob." Fields stated he was from the Maney Mob, a gang which Sydow explained had been absorbed into the Monk Mob. Other postings on Fields's Myspace page confirmed his membership in the Monk Mob.

The parties stipulated to photos of Fields's tattoos. Fields had a tattoo stating "Death B4 Dishonor." Toliver and Carmicle also sported that tattoo.

According to Sydow, Carmicle also belonged to the Monk Mob. Sydow based his opinion on crime reports, information from law enforcement, Carmicle's own statements, and postings on Carmicle's Myspace page.

Tolliver, Ferrell, Allen, and Triplett all identified Carmicle as a member of the Monk Mob. The wiretaps revealed Carmicle said he would not snitch because he was not going to be "put[ting] that on the Mob." In 2007 Carmicle admitted to officers he belonged to the Monk Mob. Carmicle's tattoo collection included "Monk Mob," "Solid Nigga," and "RIP Taz," referring to a Monk Mob member who had died.

Sydow explained that gangs place importance on the concept of respect. Gang members derive respect by inspiring fear in members of the community or in rival gangs. According to Sydow, the Monk Mob's criminal activities, drug dealing, robberies, and drive-by shootings were aimed at provoking just such fear.

13

An act of disrespect toward a gang member requires an immediate response of overwhelming force to counter the disrespect. Sydow testified that when a gang member says he is "putting in work for the gang," it means engaging in activities to make the gang look better and to diminish its rivals. Gangs do not tolerate members "snitching," and in extreme cases the snitch may be killed.

Testifying in response to a hypothetical, Sydow stated that when partygoers asked Monk Mob members to leave a party, the gang would consider that a form of disrespect for the gang. A shooting under those circumstances would send out a warning and would benefit the gang by instilling fear in nongang members. By firing into the partygoers, the gang member immediately responded to the lack of respect. Sydow was familiar with other cases in which a fistfight degenerated into a shooting when gang members were involved.

**Carmicle's Contact with Law Enforcement**

On December 31, 2007, officers conducted a traffic stop involving Carmicle. Officers found a nine-millimeter handgun on the floor of Carmicle's car. Carmicle had a blue bandana hanging out of his pants pocket. Sydow testified the bandana indicated Carmicle's allegiance with the Crip gang. Carmicle admitted being a member of the Monk Mob.

In April, following the shooting, officers conducted a warrant search of a motel room inhabited by Carmicle and three others. When an officer picked up Carmicle's pants, a nine-millimeter magazine fell out. The magazine contained nine rounds of ammunition. Officers found a nine-millimeter handgun under the bed; the magazine fit the gun.

14

**Defense Case**

*Allen's Testimony*

Allen, a lifelong friend of Fields, testified. Allen agreed to plead guilty to manslaughter in exchange for his testimony, and the district attorney dropped gang and attempted murder allegations.

Allen attended the Halloween party with the group including Fields and Carmicle. Fields and Carmicle took Ecstasy pills that night before leaving for the party. The group was going to have a good time, not look for trouble.

At the party, Toliver rejected Razaghzadeh's attempt to shake hands. Allen testified Razaghzadeh "snapped," and his friends had to hold him back.

None of Allen's companions wanted to fight, but they were wary of Razaghzadeh. Razaghzadeh charged the group and Allen attempted to punch him. Razaghzadeh slipped, and Allen heard gunshots.

Allen did not see who did the shooting, but he saw a gun in Fields's hand. Allen ran to the van, which Harris drove with Triplett and Fields as passengers. Fields held the gun and said, "Fuck, I think I shot my partna's cousin." Fields appeared to be in shock.

Carmicle did not get into the van. Harris dropped off Fields and Triplett, and drove to Allen's house with Allen. Fields left the gun in the van and Harris said "Fuck it . . . I'll take it."

During cross-examination, Allen conceded he previously testified that the gun was visible on top of the van's console as they drove to the party. None of the group objected to the gun. Allen saw nothing unusual in bringing a gun to a party. On the way to the party, Carmicle did not want the gun because it was too big to conceal under his sweatshirt. Allen thought Fields took the gun and concealed it under his bulkier coat. Allen acknowledged that he and his group knew they should leave the party, but they were taking their time doing so.

15

### *Fields's Testimony*

Fields testified in his own behalf. At the time of the shooting, Fields was a 17-year-old high school student who lived at home. He admitted he belonged to Monk Mob but said the gang had only 10 to 12 members. According to Fields, he spent his time going to school, not selling drugs or committing robberies. His "death before dishonor" tattoo referred to his loyalty to his family.

On the way to the party, when Fields got into Harris's van he knew Carmicle had a gun. Carmicle had taken Ecstasy and Fields could see he was feeling the effects of the drug. Fields had also taken Ecstasy, but was not yet feeling its impact. In the van, Carmicle passed the gun around to the others. To keep the others from playing with it, Fields put the gun in his coat pocket. The van followed the car with the rest of the group.

As the group entered the party, Fields was not concerned that he carried Carmicle's gun. No one already at the party seemed threatening. Fields went into the backyard and talked with Toliver. Fields walked over to Allen and then a big guy started pushing Allen in the chest. Fields saw someone else rushing toward them and others running behind him. He did not see Razaghzadeh fall.

Fields believed that Razaghzadeh and his friends intended to hurt him and his friends. In response, Fields pulled out the gun and, with his eyes closed, began firing. When he opened his eyes, Fields saw Ferrell's cousin fall to the ground.

Although Fields thought he had shot Ferrell's cousin, he was afraid, so he fled. As he got into the van, Fields thought, "What the fuck did I just do?" He held his head, rocking back and forth.

After Harris drove away from the party, Fields got out. He was still high and in a daze. Fields handed the gun to Allen and left.

Fields did not know he had killed anyone until the next day. He never intended to kill anyone.

**Verdict and Sentencing**

The jury found Fields and Carmicle guilty of first degree murder, count one, and three counts of attempted murder, counts two, four, and five, and found the enhancements true. The jury was unable to reach a verdict on one count of attempted murder, count three.

The court sentenced Fields to 100 years to life in state prison, consecutive to a determinate term of 45 years: on count one, 25 years to life, plus 25 years to life for personally discharging a firearm causing death, and an additional 10 years for the gang enhancement; on count two, seven years, plus 25 years to life for personally discharging a firearm causing great bodily injury, plus 10 years for the gang enhancement; on count four, two years four months, plus 25 years to life for personally discharging a firearm causing great bodily injury, plus three years four months for the gang enhancement; on count five, two years four months, plus six years eight months for personally discharging a firearm, and an additional three years four months for the gang enhancement.

Carmicle brought a motion for a new trial, which the trial court denied. The court sentenced Carmicle to a term of 100 years to life imprisonment, consecutive to a determinate term of 18 years four months: four consecutive sentences of 25 years to life for the murder and each of the firearm enhancements attached to counts one, two, and four; seven years for count two; two years eight months for counts four and five; and six years eight months for the firearm enhancement in count five.

Both defendants filed timely notices of appeal. As noted earlier, we issued our opinion affirming the judgments but thereafter granted Carmicle's petition for rehearing and vacated our decision. As summarized earlier, the parties thereafter submitted supplemental briefing on a various changes in the law brought about by legislation, ballot propositions and Supreme Court decisions following the verdict and our subsequently vacated opinion.

17

## DISCUSSION

We begin with the points of agreement between the People and defendants set forth in recent briefing.

### I

### Attempted Murder and The Kill Zone Instruction

Defendants argue the trial court gave a legally inadequate kill zone instruction, and the error compels reversal of the convictions for attempted murder.  The People agree.

In *Canizales, supra*, 7 Cal.5th 591, our Supreme Court disapproved the language of the kill zone instruction given by the trial court.  The court believed "the potential for misapplication of the kill zone theory [was] troubling" and expressed the view "that the kill zone theory for establishing the specific intent to kill required for conviction of attempted murder may properly be applied only when a jury concludes:  (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm—that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death—around the primary target and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm. Taken together, such evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm." (*Id*. at p. 607.)

The parties agree that the instruction given in the present case does not adhere to the Supreme Court's prescription parameters set forth in the *Canizales*.  The Attorney General indicates the instruction given was not wrong but was incomplete and notes that, "Since *Canizales*, CALCRIM No. 600's description of the kill zone theory has been augmented.  It now specifies that, among other things, 'the People must prove that (1) the only reasonable conclusion from the defendant's use of lethal force, is that the defendant

18

intended to create a kill zone [around a primary target]; and (2) [the alleged attempted-murder victim] was located within the kill zone.' (CALCRIM No. 600 (2020).) The revised instruction also provides a list of circumstances jurors should consider '[i]n determining whether the defendant intended to create a "kill zone" and the scope of such a zone.' (*Ibid*.) [¶] Because the jury here was instructed with the pre-revision version of CALCRIM No. 600, it was not fully and fairly instructed on the law."

As in *Canizales*, the prosecutor's argument to the jury describing the kill zone as where the shooter indiscriminately fired at others and did not care who got shot "essentially equated attempted murder with implied malice murder." (*Canizales, supra*, 7 Cal.5th at p. 614.) Consequently, "the prosecutor's argument had the potential to mislead the jury to believe that the mere presence of a purported victim in an area in which he or she could be fatally shot is sufficient for attempted murder liability under the kill zone theory." (*Ibid*.)

The Attorney General and defendants believe the error was prejudicial. We agree. Reversal of the attempted murder convictions is required.

## II

## Gang Enhancements

When defendants were convicted, section 186.22, subdivision (f) defined a "criminal street gang" as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more [enumerated] criminal acts . . . having a common name or common identifying sign or symbol, and whose members individually or collectively engage in, or have engaged in, a pattern of criminal gang activity."

Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 699) amended section 186.22, effective January 1, 2022, to narrow the definition to require proof that the members "collectively" engage in, or have engaged in a pattern of criminal gang activity. The pattern of criminal gang activity must have occurred within three years of

19

the date that the currently charged offense was committed, the offenses must have been committed by two or more gang members—not simply persons—and the common benefit to a criminal gang required to be shown must be more than reputational. Further, the currently charged offense cannot be used to establish a pattern of criminal gang activity, and the list of offenses that qualify to constitute part of a pattern was reduced from 33 to 26.

The People did not provide proof required to establish a pattern of criminal gang activity under the amended statute—no evidence that the predicate offenses commonly benefitted the Monk Mob gang, or that the benefit was more than reputational.

The Attorney General concedes the Assembly Bill No. 333 amendments apply retroactively to defendants' cases and compel us to reverse the gang enhancements and remand to provide the prosecution with an opportunity to comply with the additional requirements imposed by Assembly Bill No. 333 if it can. We accept the concession. In light of this reversal and remand, we need not consider Carmicle's arguments concerning the primary activities element of the street gang enhancement or the admissibility of certain expert testimony to support the gang enhancement.

Fields challenges aspects of his sentence, contending the section 186.22 enhancements imposed for the murder count and three attempted murder counts are unlawful under section 1170.1 and the section 186.22, subdivision (b)(1) enhancement on the murder count is contrary to section 186.22, subdivision (b)(5). Fields argues that even if the court could properly impose a section 186.22 enhancement on the murder conviction, the proper enhancement would not be the 10-year term, but rather a requirement that Fields serve a minimum of 15 years before being eligible for parole. The People concede the issue. The People also concede that Senate Bill No. 620 (2017-2018 Reg. Sess.), giving a court discretion to strike a firearm enhancement allegation, must be given retroactive effect and thus applies to this case.

20

The sentencing issues raised are rendered moot by our reversal and remand but may arise again on retrial. This includes Fields's argument, never raised before the trial court, that a sentence of 45 years plus 100 years to life for crimes committed when he was 17 years old amounts to cruel and unusual punishment in violation of the Eighth Amendment.[2]

### III

### Proposition 57 and *People v. Franklin*

We also acknowledge the passage of Proposition 57 (as approved by voters Gen. Elec., Nov. 8, 2016, eff. Nov. 9, 2016) which applies retroactively to this case and requires a remand to the juvenile court for a juvenile transfer hearing. Fields was a minor at the time of the offenses and was directly charged in adult criminal court. Proposition 57 became effective while this appeal was pending and amended the Welfare and Institutions Code to eliminate direct filing by prosecutors in adult criminal court. Minors could still be tried in adult criminal court, but only after a juvenile court judge conducted a transfer hearing to consider various factors such as their age, maturity, intellectual capacity, mental and emotional health, degree of criminal sophistication, prior delinquent history, whether they can be rehabilitated, and the circumstances and gravity of the offense alleged. (Welf. & Inst. Code, § 707, subd. (a).) The Attorney General initially argued that Proposition 57 was not intended to apply retroactively and thus did not apply to this case in which trial had been completed in adult criminal court. In *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, our Supreme Court held otherwise; accordingly, the measure must be given retroactive effect and thus applies to this case on remand.

---

[2] Fields's date of birth is December 2, 1990.

21

At any new sentencing hearing, defendants shall be given an opportunity to supplement the record with information relevant to a future youth offender parole hearing, consistent with the requirements of *People v. Franklin, supra*, 63 Cal.4th 261.

## IV

## Involuntary Manslaughter Instruction: Sudden Quarrel or Heat of Passion

Carmicle argues the court erred in failing to instruct sua sponte on voluntary manslaughter based on sudden quarrel or heat of passion. Carmicle argues substantial evidence supports a finding that when he aided and abetted Fields, he did so under the influence of sudden quarrel or heat of passion in response to legally adequate provocation. In the alternative, Carmicle asserts that, under the natural and probable consequences theory the crimes of voluntary and attempted voluntary manslaughter based on sudden quarrel or heat of passion, not murder or attempted murder, were the reasonable foreseeable consequence of the target crime of assault, which Carmicle directly aided and abetted.

A trial court has a duty, even in the absence of a request, to instruct on general principles of law relevant to the issues raised by the evidence and necessary to the jury's understanding of the case. Included in this duty is an obligation to instruct on lesser included offenses when the evidence raises a question as to whether the greater, charged crime has been proven and there is substantial evidence that only a lesser included crime was committed. (*People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*); *People v. Cole* (2004) 33 Cal.4th 1158, 1218.)

**Sudden Quarrel/Heat of Passion**

Carmicle argues the court erred in not instructing on voluntary manslaughter based upon sudden quarrel or heat of passion. An intentional unlawful homicide is a voluntary manslaughter stemming from a sudden quarrel or heat of passion if the defendant acted through strong passion aroused by a provocation sufficient to cause an ordinary person to act without due deliberation and reflection. (*Breverman, supra*, 19 Cal.4th at p. 163.)

22

Manslaughter based upon a sudden quarrel or heat of passion has an objective and a subjective component. Under the subjective component, the defendant must actually kill in the heat of passion. Under the objective component, the circumstances giving rise to the act must be objectively sufficient to provoke an ordinarily reasonable person to act rashly and without deliberation. (*People v. Cruz* (2008) 44 Cal.4th 636, 664; *People v. Enraca* (2012) 53 Cal.4th 735, 759.)

No specific type of provocation is necessary and the passion can be any violent, intense, or high-wrought emotion other than revenge. The defendant cannot have been the source of the provocation. The victim must initiate the provocation that incites the defendant to kill in the heat of passion. (*Breverman, supra*, 19 Cal.4th at p. 163; *People v. Carasi* (2008) 44 Cal.4th 1263, 1306.)

To establish the objective component, Carmicle carefully shapes the facts to portray himself as simply responding to great provocation during the party. He argues merely being an armed gang member at a party cannot rule out a heat of passion or sudden quarrel instruction. According to Carmicle, Ferrell testified that a Monk Mob member was typically armed for protection when the group went out, which is "a legitimate purpose harbored by many lawful gun owners in society." Instead, Carmicle argues, his liability rests on his words and acts at the party.

Under Carmicle's scenario, when he engaged in the acts the prosecution relied on to prove aiding and abetting, uttering gang phrases and passing Fields the gun, "he did so in response to conduct by Razaghzadeh and his associates which could have caused an ordinary person of average disposition to act rashly, out of passion rather than reason." In support, Carmicle notes his group was invited to the party and kept to itself until challenged by a drunken guest. They were falsely accused of stealing a camera and singled out for not wearing costumes. They were ordered to leave, but not by their host, and they stood their ground. Razaghzadeh became aggressive, and Carmicle mentioned Monk Mob and told him they were staying. This provides substantial evidence to support

23

the objective component of voluntary manslaughter based on sudden quarrel or heat of passion.

As for the subjective component, Carmicle, who did not testify in his own defense, contends circumstantial evidence shows he acted out of passion rather than judgment. Carmicle notes that Camp-Kelly testified Carmicle had a strange, evil look when Razaghzadeh apologized. Carmicle also points to Ferrell's testimony that, by the time of the apology, the group felt so disrespected that they could not accept the apology and Carmicle was among the loudest in opposing the other guests.

We are not convinced. Nothing in the events leading up to the shooting would lead a reasonable juror to conclude Carmicle acted during a sudden quarrel or in the heat of passion.

Carmicle and his fellow Monk Mob members attended the party with Ferrell, who had been invited to the party by one of the hosts, Camp-Kelly. Carmicle supplied the gun later used in the murder. Some time after they arrived, a large, drunk man tried to force drinks on Carmicle and his group, and Meyenberg accused the group of stealing her camera. Later, Razaghzadeh and his friends asked Carmicle's group to leave. None of these incidents, even in the aggregate, amounted to provocation sufficient to warrant a sudden quarrel or heat of passion instruction.

To the contrary, amid simmering tensions, Razaghzadeh approached Carmicle's group and apologized. Razaghzadeh shook hands with several members of the group, at which point several members of the group, including Carmicle, made derogatory remarks about Razaghzadeh and yelled "Mob." After being called a "punk bitch," Razaghzadeh became upset and charged at the group, despite the efforts of his friends to restrain him. At this point Fields shot Razaghzadeh five times with Carmicle's gun.

Nothing in this sequence of events supports Carmicle's claim that when he uttered gang phrases and passed Fields the gun, "he did so in response to conduct by Razaghzadeh and his associates which could have caused an ordinary person of average

24

disposition to act rashly, out of passion rather than reason." The incidents leading up to the murder took place over time during the party. It was a sequence of discrete events that fostered tension among gang members at a party filled with nongang members.

These tensions escalated when the party givers asked Carmicle and his group to leave. However, in response to the heightened atmosphere, Razaghzadeh attempted to defuse the situation by both apologizing and shaking hands with the group. His efforts were met with taunts and threats and, ultimately, five bullets. A defendant may not provoke a fight, become the aggressor, and, after failing to attempt to withdraw from the altercation, kill the victim and expect to reduce the crime to manslaughter by asserting the defendant was motivated by a sudden quarrel or the heat of passion. (*People v. Oropeza* (2007) 151 Cal.App.4th 73, 83.)

Carmicle characterizes Razaghzadeh's actions as "efforts to apologize" and asserts: "At best, the apology may have smoothed things over, but only momentarily. The confrontations just kept coming." This mischaracterizes the evidence. Razaghzadeh approached Carmicle's group and said "I kind of disrespected y'all, you know; just have a good time." Camp-Kelly, who had invited the group, testified Carmicle appeared to reject the apology. The confrontations that "just kept coming" consisted of Carmicle's group's verbally ridiculing and taunting Razaghzadeh as he attempted to shake hands with them. When an infuriated Razaghzadeh ran at the group, bullets stopped him. Nothing in this scenario supports Carmicle's contention that substantial evidence satisfies the objective component of voluntary and attempted manslaughter based on sudden quarrel or heat of passion.[3]

---

[3] Since we find Carmicle cannot meet the objective component, we need not address Carmicle's arguments regarding the subjective component.

# V

## Brandishing

Carmicle also faults the trial court for failing to instruct on misdemeanor manslaughter, based on brandishing, as a lesser included offense to murder. Under Carmicle's reasoning, rational jurors could have found that misdemeanor manslaughter, not murder, was the reasonably foreseeable consequence of a fistfight, the target crime that Carmicle aided and abetted.

Section 417, subdivision (a)(2) defines the offense of brandishing: "(2) Every person who, except in self-defense, in the presence of any other person, draws or exhibits any firearm, whether loaded or unloaded, in a rude, angry, or threatening manner, or who in any manner, unlawfully uses a firearm in any fight or quarrel is punishable as follows: [¶] (A) If the violation occurs in a public place and the firearm is a pistol, revolver, or other firearm capable of being concealed upon the person, by imprisonment in a county jail for not less than three months and not more than one year, by a fine not to exceed one thousand dollars($1,000), or both that fine and imprisonment. [¶] (B) In all cases, other than that set forth in subparagraph (A), a misdemeanor, punishable by imprisonment in a county jail for not less than three months."

Carmicle argues reasonable jurors could have found that misdemeanor manslaughter, not murder, was the reasonably foreseeable consequence of a fistfight, the target crime he aided and abetted even though Fields committed homicide. Under Carmicle's reasoning, jurors could have determined that the reasonably foreseeable consequence of the fistfight Carmicle encouraged was involuntary manslaughter committed during the misdemeanor of brandishing. In Carmicle's rendering, the two groups angrily pushed and shoved one another, yelled epithets and threw punches. In this atmosphere it was reasonably foreseeable that Fields might have the gun "and exhibit in a rude, angry or threatening manner, resulting in death."

26

The evidence does not support Carmicle's argument.  No testimony established that Fields "drew or exhibited" Carmicle's gun "in a rude, angry or threatening manner." Instead, witnesses described Fields's pointing the gun, pulling the trigger, and firing shots into the crowd.

Carmicle argues that whether there is substantial evidence that Fields actually killed Razaghzadeh while brandishing a firearm is of no consequence.  Since his claim is based on the natural and probable consequences theory, the question is whether there was substantial evidence that misdemeanor manslaughter based on brandishing was the reasonably foreseeable result of Carmicle's aiding and abetting the target crime. Carmicle contends the jury could have rationally found that the reasonably foreseeable result of the fight Carmicle encouraged was that Fields would negligently exhibit and discharge Carmicle's gun.

"However, the trial court need not instruct on a particular necessarily included offense if the evidence is such that the aider and abettor, if guilty at all, is guilty of something beyond that lesser offense, i.e., if the evidence establishes that a greater offense was a reasonably foreseeable consequence of the criminal act originally contemplated, and no evidence suggests otherwise."  (*People v. Woods* (1992) 8 Cal.App.4th 1570, 1578.)  Here, no evidence suggests that Carmicle was guilty of the lesser offense of brandishing.

## VI

### Instruction on Voluntary Intoxication

Both Carmicle and Fields argue that CALCRIM No. 625 improperly precluded the jury from considering Carmicle's voluntary intoxication in determining whether Fields acted in imperfect self-defense.  In addition, Carmicle contends the instruction precluded the jury from considering whether his voluntary intoxication prevented him from forming the mental state necessary for aiding and abetting.

27

**Background**

The court instructed with CALCRIM No. 625: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with an intent to kill or the defendant acted with premeditation and deliberation. [¶] A person is *voluntarily intoxicated* if he becomes intoxicated by willingly using any intoxicating drug, drink or other substance knowing that it could produce an intoxicating effect or willingly assuming the risk of that effect. [¶] You may not consider evidence of voluntary intoxication for any other purpose."

In his motion for a new trial, Carmicle made the same objections to the instruction that he makes on appeal. The trial court rejected these arguments.

The court gave CALCRIM No. 625 because Fields testified to his voluntary intoxication at the time of the crime. The court noted: "The jury rejected this defense as to Fields, and he, as well as Carmicle, was convicted of first degree murder. [¶] A defendant is entitled to a voluntary intoxication instruction only when there is substantial evidence of the defendant's voluntary intoxication and the intoxication affected the Defendant's . . . actual formation of specific intent. [Citation.] [¶] Here the voluntary intoxication instruction was unnecessary for the Defendant Carmicle. Carmicle did not testify. Simply, there was no evidence as to his level of intoxication at the time of the party when the crime occurred. There was no evidence establishing the amount of what Carmicle personally ingested, the strength of what he ingested, whether what he may have ingested earlier had worn off, any tolerance based on prior usage, or whether it actually affected the formulation of his mental state."

The court then reviewed the evidence of Carmicle's drug usage that night. The court noted Harris's testimony was inconsistent as to whether Carmicle took Ecstasy. Although Fields testified he saw Carmicle take Ecstasy before the party and thought Carmicle was high before the party, he "just, quote, figured, close quote, Carmicle was

28

high at the party." The court considered Harris's testimony speculative. In addition, although Harris testified he took two Ecstasy pills, they did not make him hallucinate. Instead, Harris testified he was able to understand his actions. Both Fields and Harris conceded that, as an illegal drug, any potential effects could vary. No testimony established the quantity or potency of the marijuana Carmicle smoked or the Ecstasy he ingested. The court concluded there was no substantive evidence that Carmicle was voluntarily intoxicated at the time of the murder.

Carmicle's trial counsel did not request any aiding and abetting voluntary intoxication instruction. The court stated: "The instructions were worded in a manner agreed upon by counsel for Defendant Carmicle, as consistent with his tactical decisions." The court also found any alleged instructional error harmless, since the jury rejected the voluntary intoxication defense as to Fields, making it improbable that it would judge Carmicle differently.

**Discussion**

Fields argues CALCRIM No. 625 improperly prevented the jury from considering evidence of his intoxication in order to assess his defense of imperfect self-defense. In Fields's view, the jury could not consider his intoxication in determining whether he actually believed when he fired the gun that he or others were in imminent danger or whether he actually believed the use of deadly force was necessary in order to meet the perceived danger. Carmicle also challenges the court's instruction on voluntary intoxication.

Fields claims CALCRIM No. 625 conflicts with section 22, subdivision (b), which provides: "Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought." According to Fields, since CALCRIM No. 625 does not mention "express malice aforethought" but instead states evidence of voluntary intoxication may

29

be considered on the issue of "intent to kill," the instruction omits the element of unlawfulness and is not a correct statement of the law.

Fields concedes the court in *People v. Turk* (2008) 164 Cal.App.4th 1361 found CALCRIM No. 625 correctly stated the law on consideration of intoxication evidence. However, Fields contends *Turk* failed to perceive that intent to kill is not the same as intent to unlawfully kill and is therefore wrongly decided.

We are not convinced by defendant's criticisms of *Turk*. In *People v. Saille* (1991) 54 Cal.3d 1103, 1119, the Supreme Court stated that, with the abolition of diminished capacity as a defense, "Intoxication is now relevant only to the extent that it bears on the question of whether the defendant actually had the requisite specific mental state." An instruction relating intoxication to any mental state is therefore "now more like the 'pinpoint' instructions" that "are not required to be given sua sponte." (*Ibid*.)

However, Carmicle argues that, although a trial court has no sua sponte duty to instruct on the relevance of intoxication, if it does so instruct, it must do so correctly. (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1134.) According to Carmicle, it is reasonably likely the jurors interpreted CALCRIM No. 625 to erroneously preclude consideration of Carmicle's voluntary intoxication on the issue of whether defendant acted with the specific intent and knowledge necessary for aiding and abetting. Under Carmicle's analysis, CALCRIM No. 625 explicitly forbade considering intoxication evidence for any purpose except whether defendant acted with intent to kill or with deliberation and premeditation.

We disagree. As the trial court determined, testimony at trial failed to provide substantial evidence that Carmicle was intoxicated to the extent he could not form the intent to aid and abet Fields in the shooting. Carmicle did not testify, and no testimony by any witness established the amount or strength of any substances he ingested. As for Fields, although he testified he took Ecstasy, his actions leading up to the shooting did

30

not reflect a level of intoxication that would prevent him from forming the intent to shoot the victim.

Nor do we find the court's instructions, even if erroneous, prejudiced either defendant. The court instructed the jury it could consider evidence of voluntary intoxication in deciding intent to kill and premeditation. The jury found the evidence sufficient to convict both defendants of premeditated murder. In convicting Fields, the jury rejected the theory that Fields actually believed he and his friends were in imminent danger of great bodily harm when he fired into the group and killed Razaghzadeh. In convicting Carmicle, the jury rejected the theory that he lacked the ability to form the specific intent to aid and abet the assault. The insertion of express malice aforethought in conjunction with the voluntary intoxication instructions would not have yielded a different result.

## VII

## Prosecutorial Misconduct

According to Carmicle, in an argument joined by Fields, the prosecutor, during closing argument, peppered his comments with improper and inflammatory remarks about gangs that inflamed the jurors' fears. These comments deprived defendants of a fair trial and influenced the jury's findings of deliberation and premeditation in an otherwise weak case. In the alternative, defendants argue trial counsel performed ineffectively in failing to object.

### Background

During his initial remarks, the prosecution stated: "When [gang members] take that gun in their waistband out into the community, it is for one purpose and one purpose only. No one is going hunting. Nobody is going target shooting that day. That gun is in that waistband because of this concept of premeditated murder. That gun is there for a purpose. That gun is meant for another human being. [¶] Remember the testimony we heard. It's typical. It's typical for Monk Mob to take a gun when we go out to a party.

31

Why? Why is it typical? Because of that gang mindset, because that's what you do. Okay. It's tough to say that these guys, when they carried that gun as gang members out in the community, have not premeditated the concept of murder."

The prosecution, during rebuttal, argued: "[H]ow can human beings act this way? How can human beings kill in cold blood? How can that occur? Okay. [¶] Both of these guys participate in a lifestyle that glorifies that . . . . [¶] These guys have chosen a lifestyle that glorifies violence, that glorifies murder. It's a lifestyle that leads you to take a gun to that party . . . . It's a lifestyle choice in which as you walk around with that gun in your pants, you are premeditating the concept of murder because that gun is for a human being. That gun is not to go hunting with. It is not for target practice. It is for a person. It is a lifestyle choice that puts you in the position where you can stand in that back yard and kill someone, that you can stand there and shoot a man five times in the back yard of his own home. It is that lifestyle choice that brings you there. [¶] I have not demonized either one of these guys. They have demonized themselves through the choices that they have made, through their associates, through the lifestyle that they lead, through their mentality."

**Discussion**

A prosecutor's conduct violates the federal Constitution when it comprises a pattern of conduct so egregious that it infects the trial with such unfairness as to deny the defendant due process. Prosecutorial conduct that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury. (*People v. Samayoa* (1997) 15 Cal.4th 795, 841 (*Samayoa*).)

As a general rule, a defendant must object to prosecutorial misconduct and request an admonishment when the misconduct occurs. (*Samayoa, supra*, 15 Cal.4th at p. 841.) The defendant's failure to object or request an admonition is excused if it either would be

32

futile or an admonition would not have cured the harm caused by the misconduct. (*People v. Hill* (1998) 17 Cal.4th 800, 820.)

Defendants argue the prosecutor stated armed gang members premeditate murder because they have adopted a lifestyle that glorifies murder. These comments, defendants contend, "were so overbroad that they were speculative and hence irrational."

Defendants admit defense counsel failed to object, but argues this failure amounts to ineffective assistance of counsel. Therefore, we address the merits of defendants' prosecutorial misconduct claim.

The prosecutor, during closing argument, discussed and described the gang lifestyle and the use of guns. The prosecutor also gave the example of someone buying a rake in the fall to rake leaves. He provided the following analogy: "The gun to the gangster is like the rake is to me. When they take that gun in their waistband out into the community, it is for one purpose and one purpose only."

These comments, as well as those defendants find objectionable, provided the prosecution's gloss on the gang expert's testimony regarding the gang lifestyle. Detective Sydow testified that gang members frequently carried guns, resulting in shootings. Sydow also stated that if a gang member feels disrespected, the gang member responds "immediately and sometimes with [an] overwhelming and unnecessary level of force." According to Sydow, a gang member's show of force was like bringing a firearm to a fistfight.

Ferrell testified that gang members carried guns when they were out to protect gang members from nongang members. Prior to the shooting, Monk Mob members commonly brought guns to parties.

We find the prosecutor's comments differ from those found objectionable in *Bains v. Cambra* (9th Cir. 2000) 204 F.3d 964, 974 (*Bains*), relied on by defendants. In *Bains*, the defendant was charged with the murder of his sister's ex-husband after the husband divorced the sister. At trial, the evidence established that all three were

33

members of the Sikh faith and that a husband's unilateral divorce may provide a motive for violent revenge by the wife's family. (*Id.* at pp. 967, 970.) The prosecutor commented that " 'If you do certain conduct with respect to a Sikh person's female family member, look out. You can expect violence,' " and in the defendant's mind, " 'the laws in the United States is [*sic*] not what we're talking about. We're playing this game by Sikh rules.' " (*Id.* at p. 970.)

The Ninth Circuit Court of Appeals found these comments constituted misconduct, stereotyping Sikhs and encouraging the jury to draw inflammatory inferences about the group. The comments stereotyped all Sikhs, including the defendant, as predisposed to violence when a family member was dishonored and incapable of abiding by the law. (*Bains, supra*, 204 F.3d at p. 975.) None of the comments in the present case rise to the level of stereotyping the defendant or inflaming the jury found objectionable in *Bains*. Instead, the prosecutor reiterated statements made by the gang expert and defendants' fellow gang members regarding gang culture and guns.

Given the evidence before the jury, the prosecution's comments on gang culture vis-à-vis guns was neither speculative nor irrational and did not "demonize" defendants or constitute inflammatory, improper argument.

## VIII

### Carmicle's Murder Conviction

Carmicle's prosecution for first degree murder was based on two theories: as a direct aider and abettor in instigating the conflict that led to the killing and providing the weapon used, and under the natural and probable consequences theory, a theory that was later rendered invalid by the Supreme Court in *People v. Chiu* (2014) 59 Cal.4th 155 and by the Legislature with the enactment of Senate Bill No. 1437 (2017-2018 Reg. Sess.). Carmicle argues his first degree murder conviction must be reversed because the jury was prejudicially instructed on the now invalid theory of natural and probable consequences

and the prosecution's closing argument was premised on that theory. Where a conviction based on natural and probable consequences is not final, it may be challenged on direct appeal based on the recently enacted Senate Bill No. 775 (2021-2022 Reg. Sess.).

The problem for us is determining whether the jury's murder verdict was based on its determination that Carmicle was a direct aider and abettor, a valid theory of guilt, or on the doctrine of natural and probable consequences, an invalid theory.

A similar situation was presented in *People v. Sanchez* (2022) 75 Cal.App.5th 191. There, the court held that, where the jury is instructed on both legally valid and invalid theories, the murder conviction must be reversed unless the court can determine beyond a reasonable doubt that the jury based its verdict on a legally valid theory. The appellate court "presume[s] the legally invalid theory infected the verdict because jurors are not ' " 'equipped to determine whether a particular theory of conviction submitted to them is contrary to law . . . .' " ' [Citation.] We 'must reverse the conviction[s] unless, after examining the entire cause, including the evidence, and considering all relevant circumstances,' we determine the error is 'harmless beyond a reasonable doubt.' " (*Id*. at pp. 196-197.)

The People argue that we can find beyond a reasonable doubt that Carmicle acted with express malice when he aided and abetted Fields's murder of Razaghzadeh by inciting a confrontation with the partygoers and providing Fields with the gun used. Thus any error in providing the jury with instructions on natural and probable consequences was harmless. There is support for the People's reading of the record. A verdict based on direct aider and abettor liability is supported by the evidence; were this a case involving the sufficiency of the evidence, affirmance might be in order. However, we cannot conclude the court's error in instructing on natural and probable consequences is harmless beyond a reasonable doubt.

This was no battle between gangs in which the lethal rules of engagement that might apply when two warring factions collide were in play. The prosecution appreciated

35

the difficulty of proving express malice. The closing arguments of both the prosecutor and the defense paid particular attention to the natural and probable consequences instruction. The prosecutor discussed direct aiding and abetting, but concluded: "While the direct aiding and abetting is the most direct route, this concept of natural and probable consequences is by far the easiest route, and either is sufficient for him to be liable for this crime." Having invited the jury to take the easy route, it is now difficult for the People on appeal to persuade that Carmicle's guilt as a direct aider and abettor was certain and established beyond a reasonable doubt.

Truly, Carmicle's conduct on the evening in question was reprehensible. He was rash, impulsive and obnoxious, and his actions were thoroughly repulsive but the question is whether the jury found he harbored express malice or instead assessed the guilt of this unwelcome guest under the theory of natural and probable consequences described by the court—"by far the easiest route" to a guilty verdict. The prosecutor emphasized this point in closing argument and again on rebuttal: "Corey Carmicle aided and abetted that murder any way you slice it. You can take the short path, which is aiding and abetting a murder. You can take the longer but easier road, which is natural and probable consequences, but either way, our gut instinct tells us, the law tells us, Corey Carmicle is just as responsible for that murder as Elijah Fields is . . . ."

The prosecutor's rebuttal argument constitutes "an especially critical period of trial" coming immediately before the jury begins to deliberate. (*People v. Pitts* (1990) 223 Cal.App.3d 606, 694; see also *U.S. v. Ayala-Garcia* (1st Cir. 2009) 574 F.3d 5, 20 ["the rebuttal context increased the likelihood of prejudice because the improper remarks were among 'the last words spoken to the jury by the trial attorneys' "].) The last words heard by the jury in this case was the prosecutor's invocation of "our gut instinct" bolstered by the law—the natural and probable consequences doctrine—as a basis on which to convict. We therefore cannot conclude the instructional error was harmless. We must reverse his murder conviction and remand for retrial under proper instructions.

36

Our conclusion in this regard renders moot Carmicle's other arguments regarding the trial court's instructions on accomplice liability

## DISPOSITION

The conviction of defendant Fields for murder is affirmed. The associated firearm and gang enhancements are reversed. The convictions of defendant Fields for attempted murder are reversed for instructional error.

The convictions of defendant Carmicle for murder and attempted murder are reversed for instructional error.

The matter is remanded for further proceedings consistent with this opinion, including proceedings consistent with Proposition 57, the exercise of discretion under Senate Bill No. 620 (2017-2018 Reg. Sess.) (Stats. 2017, ch. 682, §§ 1 & 2) and an opportunity to supplement the record with information relevant to a future youth offender parole hearing consistent with *People v. Franklin* (2016) 63 Cal.4th 261.


/s/
RAYE, P. J.



I concur:



/s/
HOCH, J.

37

MURRAY, J., Concurring.

I concur with the majority's reversal of Carmicle's murder conviction but do not totally agree with the underlying reasoning. My focus is on the evidence the Attorney General argues establishes direct aiding and abetting express malice murder and attempted murder. He argues that "[t]he evidence shows beyond a reasonable doubt that Carmicle could still have been convicted of murder and attempted murder" after the change in the law resulting from Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437).

Our high court has made clear, when it comes to alternative-theory instructional error, there is no hybrid standard for determining harmlessness. (*People v. Aledamat* (2019) 8 Cal.5th 1 (*Aledamat*).) Rather, "*the usual* 'beyond a reasonable doubt,' " *Chapman* standard applies. (*Aledamat*, at p. 3, citing *Chapman v. California* (1967) 386 U.S. 18, 24, italics added.) Under that standard, "[t]he reviewing court must reverse the conviction unless, after examining the entire cause, *including the evidence*, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt." (*Aledamat,* at p. 3., italics added.) The reviewing court asks: " 'Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?' " (*People v. Merritt* (2017) 2 Cal.5th 819, 827, quoting *Neder v. United States* (1999) 527 U.S. 1, 18, 119 [144 L.Ed.2d 35], italics added; accord *People v. Powell* (2021) 63 Cal.App.5th 689, 715.)

In *People v. Glukhoy* (2022) ___ Cal.App.5th ___ , 2022 WL 1134484, another panel of this court recently considered the application of *Chapman*, *Neder* and *Aledamat* in the context of alternative-theory instructional error resulting from the changes brought about by Senate Bill 1437. Based on federal circuit court cases cited with apparent approval by our high court in *Aledamat*, we held that the alternative-theory error in *Glukhoy* was harmless beyond a reasonable doubt because the evidence establishing the

1

valid theory of direct aiding and abetting was overwhelming and a rational jury would have found the defendant guilty based on that theory absent the error. (*Glukhoy*, at p. ___ , 2022 WL 1134484, *1, *23-24, *32 citing *United States v. Skilling* (5th Cir. 2011) 638 F.3d 480, 483 (*Skilling II*) [concluding that alternative-theory error related to an invalidated theory of a charged conspiracy was harmless beyond a reasonable doubt because evidence of a valid theory of the conspiracy also advanced at trial was "overwhelming"]; *United States v. Black* (7th Cir. 2010) 625 F.3d 386, 393 ["the evidence of [the valid theory was] so compelling that no reasonable jury could have refused to convict the defendants of it"].)[4]

What we gleaned from *Aledamat* and the federal cases it cited is that there is more than one way to establish *Chapman* harmlessness as to alternative-theory error. Based on these cases, I believe an analysis focusing on "whether the jury's murder verdict was based on its determination that Carmicle was a direct aider and abettor. . . or on the doctrine of natural and probable consequences" examines the question of harmless error through an aperture that is too narrow. We must "examin[e] the entire cause, *including*

---

[4] The *Glukhoy* panel also discussed two other federal circuit court cases that had been cited with apparent approval in *Aledamat*, *Bereano v. United States* (4th Cir. 2013) 706 F.3d 568, 578 and *United States v. Jefferson* (4th Cir. 2012) 674 F.3d 332, 361. (*Aledamat*, *supra*, 8 Cal.5th at p. 11.) The courts in those cases employed a slightly different test focusing on the nature of the evidence establishing the valid theory. (See *Bereano,* at p. 578, ["[I]f the evidence that the jury necessarily credited in order to convict the defendant under the instructions given . . . is such that the jury must have convicted the defendant on the legally adequate ground *in addition to or instead of the legally inadequate ground*, the conviction may be affirmed," italics added]; *Jefferson,* at p. 361 [same].) Based on these cases, and our review of the record in *Glukhoy*, we concluded that the evidence establishing the valid theory of direct aiding and abetting was the very same evidence the jury had to have credited in finding that defendant aided and abetted the target crime for the natural and probable consequences theory. (*Glukhoy*, *supra*, ___ Cal.App.5th at pp. ___ ; 2022 WL 1134484, *29.) Consequently, we concluded from this additional circumstance that the jury would have convicted the defendant on the legally valid ground in addition to the legally invalid theory. (*Ibid.*)

2

*the evidence*, and consider[] *all relevant circumstances*." (*Aledamat*, *supra*, 8 Cal.5th at p. 3, italics added.) If, after making that examination, we can conclude the verdict "*would have been the same*" based on the overwhelming nature of the evidence establishing the valid theory, then we can conclude the error was harmless beyond a reasonable doubt. (*Glukhoy*, *supra*, ___ Cal.App.5th at pp. ___ ; 2022 WL 1134484, *22-26, italics added.) However, as I shall discuss, the problem for the Attorney General here is that the evidence does not overwhelmingly establish Carmicle's guilt on a direct aiding and abetting theory.

The majority appears to rely on *People v. Sanchez* (2022) 75 Cal.App.5th 191 (*Sanchez*). (Maj. opn. at p. 36.) The *Sanchez* court found the Senate Bill 1437 alternative-theory error there related to the natural and probable consequences doctrine was not harmless because it could not "conclude the jury did not rely on this now-invalid theory." According to the *Sanchez* court, the record "d[id] not provide any insight into the jury's deliberations" and therefore "the theory underlying the verdict is impossible to divine." (*Sanchez*, at p. 197.) But, given that the "usual" harmless error standard applies to alternative-theory error, there is no one exclusive way to determine harmlessness. (*Glukhoy*, *supra*, ___ Cal.App.5th at p. ___ ; 2022 WL 1134484, *22.)

While citing *Aledamat*, the *Sanchez* court relied on our high court's earlier opinions in *People v. Chiu* (2014) 59 Cal.4th 155 and *In re Martinez* (2017) 3 Cal.5th 1216, in its harmless error analysis. (*Sanchez, supra*, 75 Cal.App.5th at pp. 196-197.) In *Martinez*, the court stated that alternative-theory error, "requires reversal unless the reviewing court concludes beyond a reasonable doubt that the jury actually relied on a legally valid theory in convicting the defendant of first degree murder." (*Martinez,* at pp. 1218, 1225 [discussing *Chiu* error].) Focusing on how the jury arrived at its verdict, the court in *Martinez* reasoned that "once [the defendant] has shown that the jury was instructed on correct and incorrect theories of liability, the presumption is that the error affected the judgment." (*Id*. at p. 1224.)

3

But, as we pointed out in *Glukhoy*, the *Aledamat* court clarified that the *Chiu*/*Martinez* means of determining harmlessness was not exclusive and, "*Chiu* and *Martinez* were only a specific application of the more general reasonable doubt test." (*Glukhoy*, *supra*, ___ Cal.App.5th at p. ___ ; 2022 WL 1134484, *25, citing *Aledamat, supra*, 8 Cal.5th at p. 12.)[5] As the *Glukhoy* panel further noted, our high court in *Aledamat* explained: " 'the reviewing court is not limited to a review of the verdict itself. An examination of the actual verdict may be sufficient to demonstrate harmlessness, but it is not necessary. In both *Chiu* and *Martinez*, we examined the record and found that it affirmatively showed the jury might have based its verdict on the invalid theory. *Because no other basis to find the error harmless beyond a reasonable doubt was at issue, we did not explore whether other ways of finding the error harmless existed. Those cases merely provide one way in which a court might evaluate harmlessness. They do not preclude other ways*.' " (*Glukhoy*, at p. ___ ; 2022 WL 1134484, *25, quoting *Aledamat*, at p. 13, italics added.)

Accordingly, the method the *Sanchez* court apparently thought was the exclusive way of determining harmlessness beyond a reasonable doubt based on *Chiu* and *Martinez*, is not the only way. In my view, focusing on how the jury arrived at its verdict (including the prosecution's argument channeling the jury toward a specific verdict) ignores other means of establishing harmlessness. And, unlike in *Chiu* and *Martinez*, the Attorney General here asserts a different basis to find the error harmless beyond a reasonable doubt — one that looks to the evidence establishing a valid theory. *Chapman* harmlessness can be established when the evidence supporting a valid theory is

_____

[5] In *Glukhoy*, we discussed the *Aledamat* court's clarification of *Chiu* and *Martinez* in the context of concluding the analysis in *People v. Thompkins* (2020) 50 Cal.App.5th 365 also focused the harmless error analysis for alternative-theory error "through an aperture that is too narrow." (*Glukhoy*, *supra*, ___ Cal.App.5th at p. ___ ; 2022 WL 1134484, *25.)

4

overwhelming. (*Glukhoy*, *supra*, ___ Cal.App.5th at p. ___ , 2022 WL 1134484, *1, *23-24, *32, citing *Skilling II, supra*, 638 F.3d at p. 483) This test could be met in cases where, as here, the prosecutor argued both the legally valid and the subsequently invalidated theory. (See *Glukhoy*, at p. ___; 2022 WL 1134484, *30-32.) Thus, the Attorney General's evidence-based argument cannot be rejected based solely on consideration of how the jury arrived at its verdict.

However, while I part ways with the majority as to the underlying reasoning, I nevertheless concur with the result as to Carmicle's murder conviction, because the evidence of direct aiding and abetting here is not overwhelming for purposes of *Chapman* harmless error analysis.

In this regard, the Attorney General relies on the testimony of Willie Harris, who saw Carmicle pass his gun to Fields, telling Fields, "Here, I can't hold this. I'm too fucked up to hold this." Fields, thereafter, began firing the gun. Two interpretations of this evidence are apparent. One is that Carmicle felt he was too intoxicated to use the weapon effectively, so he gave it to Fields to shoot the victims. The other, consistent with Carmicle's use of the word "hold," is that he merely wanted Fields to hold on to the gun during whatever physical melee was about to ensue. While sufficient under the substantial evidence test to support a murder conviction, this is not overwhelming evidence establishing Carmicle's intent to kill supporting a finding of direct aiding and abetting beyond a reasonable doubt. Consequently, I cannot find that the verdict would have been the same had the jury not been instructed on the now invalidated natural and probably consequences doctrine and therefore, I cannot find the alternative-theory error here is harmless beyond a reasonable doubt.

Accordingly, I concur with the majority that Carmicle's murder and attempted murder convictions must be reversed and his matter must be remanded for a new trial on valid theories of aider and abettor liability for murder and attempted murder. (See *People v. Hola* (2022) ___ Cal.App.5th ___, 2022 WL 1078221, *5-10.)

5

I concur in the majority opinion in all other respects.

                                        _____/s/_____
                                        MURRAY, J.*

———————————

* Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

6